STATE of Wisconsin,
Plaintiff-Respondent,

v.

Tyrone L. DUBOSE,
Defendant-Appellant-Petitioner.

Supreme Court

*No. 2003AP1690–CR. Oral argument March 2, 2005.
—Decided July 14, 2005.*

2005 WI 126

(Also reported in 699 N.W.2d 582.)

144

For the defendant-appellant-petitioner there were briefs and oral argument by *Jefren E. Olsen,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *David H. Perlman,* assistant attorney general, with whom on the brief was *Peggy A. Lautenschlager,* attorney general.

An amicus curiae brief was filed by *Keith A. Findley, John A. Pray* and *Byron C. Lichstein,* Madison, on behalf of the Wisconsin Innocence Project of the Frank J. Remington Center, University of Wisconsin Law School.

¶ 1. N. PATRICK CROOKS, J. Petitioner Tyrone Dubose (Dubose) seeks review of an unpublished decision of the court of appeals that affirmed the circuit court's judgment of conviction for armed robbery. The main issue presented to us is whether the circuit court erred in denying Dubose's motion to suppress the

victim's out-of-court identifications of him, after determining that the eyewitness identification procedures used, including two showups,[1] were not impermissibly suggestive, nor the result of an illegal arrest.

¶ 2.   We agree with Dubose that the circuit court erred in denying his motion to suppress the out-of-court identification evidence. However, we decline to adopt his proposed per se exclusionary rule regarding such evidence. Instead, we adopt standards for the admissibility of out-of-court identification evidence similar to those set forth in the United States Supreme Court's decision in *Stovall v. Denno,* 388 U.S. 293 (1967). We hold that evidence obtained from such a showup will not be admissible unless, based on the totality of the circumstances, the showup was necessary. A showup will not be necessary, however, unless the police lacked probable cause to make an arrest or, as a result of other exigent circumstances, could not have conducted a lineup or photo array. Since the motion to suppress the out-of-court identifications of Dubose should have been granted here, because such identifications were unnecessarily suggestive, we reverse the decision of the court of appeals and remand the case to the circuit court for further proceedings consistent with the standards adopted herein.

I

¶ 3.   Timothy Hiltsley (Hiltsley) and Ryan Boyd (Boyd) left the Camelot Bar in Green Bay, Wisconsin, at approximately 1:00 a.m. on January 9, 2002. Hiltsley

---

[1] "A 'showup' is an out-of-court pretrial identification procedure in which a suspect is presented singly to a witness for identification purposes." *State v. Wolverton,* 193 Wis. 2d 234, 263 n.21, 533 N.W.2d 167 (1995) (citing *Stovall v. Denno,* 388 U.S. 293, 302 (1967)).

had been drinking at the bar and admitted to being "buzzed" when he left. In the parking lot, Hiltsley and Boyd encountered a group of men, some of whom Hiltsley recognized as regular customers of a liquor store where he worked. Dubose, an African-American, was one of the men he allegedly recognized. After a brief conversation, Hiltsley invited two of the men, along with Boyd, to his residence to smoke marijuana.

¶ 4.   When they arrived at Hiltsley's apartment, Hiltsley sat down on the couch to pack a bowl of marijuana. At that time, Dubose allegedly held a gun to Hiltsley's right temple and demanded money. After Hiltsley emptied his wallet and gave the men his money, the two men, both African-Americans, left his apartment.

¶ 5.   Within minutes after the incident, at approximately 1:21 a.m., one of Hiltsley's neighbors called the police to report a possible burglary. She described two African-American men fleeing from the area, one of whom was wearing a large hooded flannel shirt. At the same time, Hiltsley and Boyd attempted to chase the men. They searched for the men in Boyd's car and hoped to cut them off. After driving nearly two blocks, Hiltsley got out of the car and searched for the men on foot. During his search, Hiltsley flagged down a police officer that was responding to the burglary call. Hiltsley told the officer that he had just been robbed at gunpoint. He described the suspects as African-American, one standing about 5–feet 6–inches, and the other man standing a little taller.

¶ 6.   Another police officer also responded to the burglary call. As he neared the scene, he observed two men walking about one-half block from Hiltsley's apartment. This officer, Jeffrey Engelbrecht, was unable to determine the race of the individuals, but noted that

149

one of the men was wearing a large hooded flannel shirt. When the officer turned his squad car around to face the men, they ran east between two houses. The police quickly set up a one-block perimeter in order to contain the suspects.

¶ 7.  The officer subsequently requested headquarters to dispatch a canine unit to help search for the men. While he waited at the perimeter for the canine unit, police headquarters reported another call in regard to an armed robbery at Hiltsley's apartment. The report indicated that the two suspects were African-American males, that one was possibly armed, and that the two calls were probably related. Upon their arrival, the canine unit officer and his dog began tracking the suspects within the perimeter. The dog began barking near a wooden backyard fence, and the officer demanded that the person behind the fence come out and show his hands. A male voice responded that he was going to surrender and asked why the police were chasing him. The male who came out from behind the fence was Dubose, who was subsequently arrested.

¶ 8.  Dubose, who was not wearing a flannel shirt, told the police that he had been in an argument with his girlfriend and that he had just left her house. He thought she might have called the police on him, which is why he ran when he saw the squad car. After his arrest, he was searched. The search did not uncover any weapons, money, or contraband.[2] Dubose was then placed in the back of a squad car and driven to an area near Hiltsley's residence.

---

[2] At approximately 3:57 a.m., two police officers attempted to retrace Dubose's movements to see if they could locate the weapon used in the alleged robbery. They located a semi-automatic pistol near the two houses where Dubose allegedly ran with the unidentified man.

¶ 9. At this location, the officers conducted a showup procedure, giving Hiltsley the opportunity to identify one of the alleged suspects. The officers placed Hiltsley in the backseat of a second squad car, which was parked so that its rear window was three feet apart from the rear window of the squad car containing Dubose. The dome light was turned on in the car containing Dubose. The officers told Hiltsley that Dubose was possibly one of the men who had robbed him at gunpoint, and asked Hiltsley if he could identify the man in the other squad car. Hiltsley told the police that he was 98 percent certain that Dubose, who sat alone in the back seat of the other squad car, was the man who held him at gunpoint. Hiltsley also told the police that he recognized him due to his small, slender build and hairstyle.

¶ 10. The squad cars separated and took both Hiltsley and Dubose to the police station. Approximately 10 to 15 minutes after the first showup, the police conducted a second showup. There, Hiltsley identified Dubose, alone in a room, through a two-way mirror. Hiltsley told police that Dubose was the same man he observed at the previous showup, and that he believed Dubose was the man who robbed him. A short time after the second showup, the police showed Hiltsley a mug shot of Dubose, and he identified him for a third time.

¶ 11. The State of Wisconsin (State) charged Dubose with armed robbery. Dubose filed a motion to suppress all identifications of him in connection with the case, specifically asserting that the first showup was "unnecessarily suggestive and conducive to an irreparable mistaken identification. . . ." He also claimed that the identifications were the fruits of an unlawful arrest, which denied him due process of law. The Brown

151

County Circuit Court, Sue E. Bischel, Judge, denied Dubose's motion and scheduled a jury trial. At trial, Hiltsley testified about the events and subsequent showups that occurred on January 9, 2002. He also identified Dubose in the courtroom as the man who held him at gunpoint on the night in question. The jury convicted Dubose of armed robbery on September 5, 2002.

¶ 12. Dubose appealed his conviction to the court of appeals. In an unpublished opinion, the court of appeals affirmed the judgment of the circuit court. The court held that the totality of the circumstances demonstrated that Dubose's arrest was lawful, and that Dubose had not met his burden to prove the impermissible suggestiveness of the out-of-court identifications. In concluding that there was probable cause for arrest, the appellate court relied on several factors, including the time of the arrest, the proximity of Dubose's location to Hiltsley's apartment, Dubose's similarity to the description provided by dispatch, and Dubose's flight after seeing the police car.

¶ 13. The court of appeals also determined that the first showup was not impermissibly suggestive. Dubose's argument concerning suggestiveness relied on the fact that he sat alone in the police vehicle, the witness had been drinking and was "buzzed," the identification occurred shortly after the robbery occurred while Hiltsley was upset, and the officers suggested to Hiltsley before the showup they had possibly caught "one of the guys." The court of appeals held that the showup was not impermissibly suggestive based on the totality of the factors involved.

¶ 14. Likewise, the court rejected Dubose's challenge to the second showup at the police station. The court was not persuaded by Dubose's argument that he

was the only suspect shown to Hiltsley, and that the second showup occurred too soon after the first one. The court held that showing only one suspect to Hiltsley does not, by itself, render a showup impermissibly suggestive. In responding to Dubose's other argument, that the timing of the showups was too closely related, the court of appeals held:

> First, to the extent that Dubose claims this second identification was premised on an earlier mistaken identification, we note that our inquiry rests solely on the suggestiveness of the police procedures used in garnering an individual's identification and whether those procedures create impermissible suggestiveness. Therefore Dubose's contention that the second identification allowed Hiltsley to confirm an earlier mistake misses the point.

> Second, Dubose has not provided any authority to support his assumption that a subsequent identification must occur after a period of time has lapsed to ensure the identification is separate and independent, thereby preventing impermissible suggestiveness. In reality, Dubose's argument relates only to the reliability of the identification. Without there being any impermissible suggestiveness in the second showup, the reliability of the identification is immaterial for our purposes of considering whether a defendant's due process rights have been violated.

*State v. Dubose*, 2003AP1690–CR, unpublished slip op., ¶¶ 36–37 (Wis. Ct. App. March 2, 2004).

¶ 15. Dubose petitioned this court for review. We granted his petition on October 19, 2004, and now, for the reasons set forth herein, reverse the decision of the court of appeals. Accordingly, we remand this case to the circuit court for further proceedings consistent with this opinion.

153

## II

¶ 16.   On review of a motion to suppress, this court employs a two-step analysis. *State v. Eason,* 2001 WI 98, ¶ 9, 245 Wis. 2d 206, 629 N.W.2d 625. First, we review the circuit court's findings of fact. We will uphold these findings unless they are against the great weight and clear preponderance of the evidence. *State v. Martwick,* 2000 WI 5, ¶ 18, 231 Wis. 2d 801, 604 N.W.2d 552. "In reviewing an order suppressing evidence, appellate courts will uphold findings of evidentiary or historical fact unless they are clearly erroneous." *State v. Kieffer,* 217 Wis. 2d 531, 541, 577 N.W.2d 352 (1998); *see also State v. Harris,* 206 Wis. 2d 243, 249–50, 557 N.W.2d 245 (1996). Next, we must review independently the application of relevant constitutional principles to those facts. *State v. Vorburger,* 2002 WI 105, ¶ 32, 255 Wis. 2d 537, 648 N.W.2d 829. Such a review presents a question of law, which we review de novo, but with the benefit of analyses of the circuit court and court of appeals. *See Kieffer,* 217 Wis. 2d at 541.

## III

¶ 17.   Our analysis begins with a summary of the law relating to the right to due process in out-of-court identification procedures. In *Stovall,* the United States Supreme Court considered for the first time whether, and under what circumstances, out-of-court identification procedures could implicate a defendant's right to due process.[3] The defendant in that case, an African-

---

[3] Prior to *Stovall,* the United States Supreme Court had never applied the due process analysis to the admissibility of eyewitness testimony. *See* Benjamin E. Rosenberg, *Rethinking*

American male, was arrested for murder. Without time to consult with or retain counsel, the defendant was taken to the hospital room of the only surviving witness to the alleged crime. The witness had been stabbed multiple times and was awaiting surgery. The defendant was handcuffed to one of five police officers who, along with two prosecutors, brought him into the hospital room. He was the only African-American in the room. The witness subsequently identified the defendant from her hospital bed after a police officer asked her if he "was the man," and the defendant uttered a few words for the purpose of voice identification. The witness later recovered, and testified at the defendant's trial as to the events that occurred in her hospital room. At that time, she also made an in-court identification of the defendant. *Stovall,* 388 U.S. at 295.

¶ 18.   The United States Supreme Court considered whether the confrontation in the hospital room was "so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *Id.* at 302. The Court concluded that due process was a recognized ground of attack under such circumstances, as "[t]he practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Id.* (footnote omitted). Nevertheless, the Supreme Court held that the existence of a due process violation "depends on the totality of the circumstances

*the Right to Due Process in Connection With Pretrial Identification Procedures: An Analysis and a Proposal,* 79 Ky. L.J. 259, 264 (1991). In discussing identification procedures, Justice William J. Brennan, Jr., writing for the Court, stated: "The overwhelming majority of American courts have always treated the evidence question not as one of admissibility but as one of credibility for the jury." *Stovall,* 388 U.S. at 299–300.

surrounding it" and that this case did not present such a violation. *Id.* The Court determined that necessity is a key factor in reviewing whether a showup violates due process. Although the identification was suggestive, the Court determined that it did not violate the defendant's right to due process because the procedure was necessary. It held:

> "Here was the only person in the world who could possibly exonerate Stovall. Her words, and only her words, 'He is not the man' could have resulted in freedom for Stovall. The hospital was not far distant from the courthouse and jail. No one knew how long Mrs. Behrendt might live. Faced with the responsibility of identifying the attacker, with the need for immediate action and with the knowledge that Mrs. Behrendt could not visit the jail, the police followed the only feasible procedure and took Stovall to the hospital room. Under these circumstances, the usual police station line-up, which Stovall now argues he should have had, was out of the question."

*Id.* (citation omitted). Thus, while the out-of-court identification was not suppressed in that case, *Stovall* "established a due process right of criminal suspects to be free from confrontations that, under all circumstances, are unnecessarily suggestive. The right was enforceable by exclusion at trial of evidence of the constitutionally invalid identification." *Manson v. Brathwaite,* 432 U.S. 98, 120 (1977) (Marshall, J., dissenting).

¶ 19.  On the same day that the United States Supreme Court decided *Stovall,* it also decided *United States v. Wade,* 388 U.S. 218 (1967) and *Gilbert v. California,* 388 U.S. 263 (1967). These decisions all reflected the Court's concern about the reliability of out-of-court eyewitness identification evidence. *See*

156

*Brathwaite,* 432 U.S. at 120 (Marshall, J., dissenting). Particularly, in *Wade,* the Court made strong statements about the dangers involved with eyewitness identifications:

> [T]he confrontation compelled by the State between the accused and the victim or witnesses to a crime to elicit identification evidence is peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial. The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification.

*Wade,* 388 U.S. at 228 (footnote omitted). The foundation of this "trilogy" of cases was "the Court's recognition of the 'high incidence of miscarriage of justice' resulting from the admission of mistaken eyewitness identification evidence at criminal trials." *Brathwaite,* 432 U.S. at 119 (Marshall, J., dissenting) (citation omitted).

¶ 20.    After *Stovall, Wade,* and *Gilbert,* the United States Supreme Court next considered the identification issue in *Simmons v. United States,* 390 U.S. 377 (1968). In that case, the defendant was convicted of armed robbery based on in-court identification. However, the in-court identification witnesses had been shown photographs of the defendant prior to trial. The defendant argued that the in-court identifications were tainted, because the out-of-court photo identification was suggestive.

¶ 21.    The Court, attempting to follow the "totality test" developed in *Stovall,* determined that the in-court identification was not tainted. However, "the exclusionary effect of *Stovall* had already been accomplished, since the prosecution made no use of the suggestive confrontation. *Simmons,* therefore, did not deal with

the constitutionality of the out-of-court identification procedure. The only question was the impact of the Due Process Clause on an in-court identification that was not itself unnecessarily suggestive." *Brathwaite,* 432 U.S. at 121–22 (Marshall, J., dissenting).

¶ 22. The United States Supreme Court nevertheless held in *Simmons* "that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons,* 390 U.S. at 384. In so holding, however, the Supreme Court "delineated a more expansive definition of totality than the one established in *Stovall.*" David E. Paseltiner, *Twenty-Years of Diminishing Protection: A Proposal to Return to the Wade Trilogy's Standards,* 15 Hofstra L. Rev. 583, 589 (1987). "Substitution of the word 'permissible' for 'unnecessarily' creates the impression that what may be 'unnecessary' could still be 'permissible.' Moreover, replacing 'conducive to irreparable mistaken identification' with 'a very substantial likelihood of irreparable misidentification' requires a much higher level of proof on the part of the defendant." *Id.* (footnote omitted). As a result, *Stovall* and *Simmons* established two different due process tests for two different factual scenarios. *See Brathwaite,* 432 U.S. at 122 (Marshall, J., dissenting).[4]

---

[4] The distinction established between the circumstances presented in *Stovall* and *Simmons v. United States,* 390 U.S. 377 (1968), was preserved in two succeeding United States Supreme Court cases: *Coleman v. Alabama,* 399 U.S. 1 (1970) and *Foster v. California,* 394 U.S. 440 (1969).

¶ 23. In *Neil v. Biggers,* 409 U.S. 188 (1972), the United States Supreme Court shifted away from its reliance on the "necessity" of the out-of-court identification as set forth in *Stovall* and, instead, emphasized the standard of reliability established in *Simmons.*[5] In *Biggers,* the police conducted a showup that consisted of two detectives walking the defendant past the victim at the police station. At the victim's request, the police directed the respondent to say "shut up or I'll kill you." The victim identified the defendant after the showup and then later at trial. The defendant objected to the admissibility of the out-of-court identification.

¶ 24. The Supreme Court determined that an improper out-of-court identification alone does not require the exclusion of the evidence. The Court concluded that evidence from a suggestive identification would be admissible if a court can find it reliable under the totality of the circumstances. In order to determine if an identification is reliable under the totality of the circumstances, the Court developed a five-part test: (1) the opportunity of the witness to view the defendant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *See Biggers,* 409 U.S. at 199–200.[6]

---

[5] In *Neil v. Biggers,* 409 U.S. 188 (1972), "the Court observed that the challenged procedure occurred pre-*Stovall* and that a strict rule would make little sense with regard to a confrontation that preceded the Court's first indication that a suggestive procedure might lead to the exclusion of evidence." *Manson v. Brathwaite,* 432 U.S. 98, 107 (1977) (citation omitted).

[6] In response to this decision, one commentator observed:

¶ 25. The United States Supreme Court's next significant eyewitness identification case was *Manson v. Brathwaite*. In that case, a police officer made a positive out-of-court photo identification of the defendant two days after he conducted an undercover purchase of drugs from the defendant. Both parties agreed that the identification was improperly suggestive. The Supreme Court held that, under the totality of the circumstances, the identification was reliable even though the confrontation procedure was suggestive. *Brathwaite*, 432 U.S. at 106. The Court reaffirmed *Biggers* and held that "reliability is the linchpin in determining the admissibility of identification testimony. . . . The factors to be considered are set out in *Biggers*." *Id.* at 114 (citation omitted).

¶ 26. With guidance from the United States Supreme Court, this court has adopted the test set forth in *Biggers* and *Brathwaite* in an attempt to minimize the misidentification of defendants in Wisconsin. *See State v. Wolverton*, 193 Wis. 2d 234, 533 N.W.2d 167 (1995); *Fells v. State*, 65 Wis. 2d 525, 223 N.W.2d 507 (1974) (in a case involving lineup and photo identifications, the-

---

[T]he Court moved from the relatively objective tests of *Gilbert v. California*, 388 U.S. 263 (1967) and *Stovall* to a subjective test. The *Biggers* test first requires the determination of suggestiveness under an expansive reading of the totality test, and then, even if the lineup is found to be suggestive, it may still be used, if, after weighing all the factors surrounding the lineup, it is found to be reliable. *Biggers,* therefore, makes it difficult for the defendant to prove suggestiveness, while at the same time making it easier for the prosecution to use a suggestive identification. The courts are thus able to dismiss flagrant violations on a finding of reliability, and the police have little to fear concerning the suppression of suggestive identifications.

David E. Paseltiner, *Twenty-Years of Diminishing Protection: A Proposal to Return to the Wade Trilogy's Standards*, 15 Hofstra L. Rev. 583, 592 (1987)(footnotes omitted).

proper procedure is to first determine if the identification was "unnecessarily suggestive," and, if so, decide whether, under the totality of circumstances, the identification was nevertheless reliable). In *Wolverton,* this court decided a case that presented similar factual circumstances to the case presently before us. There, the police conducted showups in driveways of different witnesses to different incidents. The suspect was positively identified while sitting alone in the back of a squad car. The identifications took place shortly after the alleged incidents, and the witnesses later identified the suspect at trial.

¶ 27. In relying on *Biggers* and *Brathwaite,* we held that if the criminal defendant demonstrates that the showup was impermissibly suggestive, the burden "shifts to the state to demonstrate that 'under the "totality of the circumstances" ' the identification was reliable. . . ." *Wolverton,* 193 Wis. 2d at 264. Accordingly, we upheld the admissibility of the out-of-court identifications, not under standards involving due process and necessity as set forth in *Stovall,* but because under the totality of the circumstances, such identifications were determined to be reliable.

IV

¶ 28. This case presents us with an opportunity to revisit our position with regard to the United States Supreme Court decisions in *Biggers* and *Brathwaite.* The State urges us to reaffirm our adherence to these holdings, and again conclude that evidence from an impermissibly suggestive out-of-court identification can still be used at trial if, based on the totality of the circumstances, the identification was reliable. In contrast, Dubose asks us to abandon this approach and apply a per se exclusionary rule in cases where out-of-court identifications were impermissibly suggestive.

161

¶ 29. We begin our assessment by recognizing that much new information has been assembled since we last reviewed the showup procedure in *Wolverton*. Over the last decade, there have been extensive studies on the issue of identification evidence, research that is now impossible for us to ignore. *See* Nancy Steblay et al., *Eyewitness Accuracy Rates in Police Showup and Lineup Presentations: A Meta-Analytic Comparison*, 27 L. & Human Behav. 523 (2003); Winn S. Collins, *Improving Eyewitness Evidence Collection Procedures in Wisconsin*, 2003 Wis. L. Rev. 529; Gary L. Wells & Elizabeth Olson, *Eyewitness Testimony*, 54 Ann. Rev. Psychol. 277 (2003); Tiffany Hinz & Kathy Pezdek, *The Effect of Exposure to Multiple Lineups on Face Identification Accuracy*, 25 L. & Human Behav. 185 (2001); U. S. Department of Justice, *Eyewitness Evidence: A Guide for Law Enforcement* (1999), *available at* http://www.ncjrs.org/pdffiles1/nij/178240.pdf; Gary L. Wells & Amy L. Bradfield, *"Good, You Identified the Suspect": Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience*, 83 J. Appl. Psych. 360 (1998); Gary L. Wells et al., *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22 L. & Human Behav. 603 (1998); U.S. Department of Justice, *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial*, (1996), *available at* http://www.ncjrs.org/pdffiles/dnaevid.pdf.

¶ 30. These studies confirm that eyewitness testimony is often "hopelessly unreliable." *Commonwealth v. Johnson*, 650 N.E.2d 1257, 1262 (Mass. 1995). The research strongly supports the conclusion that eyewitness misidentification is now the single greatest source of wrongful convictions in the United States, and re-

sponsible for more wrongful convictions than all other causes combined. *See* Wells, *Eyewitness Identification Procedures*, 22 L. & Human Behav. at 6. In a study conducted by the United States Department of Justice of 28 wrongful convictions, it determined that 24 (85 percent) of the erroneous convictions were based primarily on the misidentification of the defendant by a witness. Collins, *Improving Eyewitness Evidence Collection Procedures in Wisconsin,* 2003 Wis. L. Rev. at 532–33. In a similar study conducted by the Innocence Project at the Benjamin Cardozo School of Law, mistaken identifications played a major part in the wrongful conviction of over two-thirds of the first 138 postconviction DNA exonerations. *Available at,* http://www.innocenceproject.org/causes/mistakenid.php. These statistics certainly substantiate Justice William J. Brennan, Jr.'s concerns in *Wade* that "the annals of criminal law are rife with instances of mistaken identification." *Wade,* 388 U.S. at 228 (footnote omitted).

¶ 31.    In light of such evidence, we recognize that our current approach to eyewitness identification has significant flaws.[7] After the Supreme Court's decisions in *Biggers* and *Brathwaite,* the test for showups evolved from an inquiry into unnecessary suggestiveness to an inquiry of impermissible suggestiveness, while forgiving impermissible suggestiveness if the identification could be said to be reliable. Studies have now shown

_____

[7] As further evidence of a flawed procedure, we note that the Wisconsin Attorney General's Office has recently adopted a *Model Policy and Procedure for Eyewitness Identification.* The policy was a result of "[r]esearch and nationwide experience (which) demonstrated that eyewitness evidence can be a particularly fragile type of evidence, and that eyewitnesses can be mistaken." Wisconsin Department of Justice, *Model Policy and Procedure for Eyewitness Identification* at 2, *available at,* http://www.doj.state.wi.us/dles/tns/EyewitnessPublic.pdf.

that approach is unsound, since it is extremely difficult, if not impossible, for courts to distinguish between identifications that were reliable and identifications that were unreliable. "Considering the complexity of the human mind and the subtle effects of suggestive procedures upon it, a determination that an identification was unaffected by such procedures must itself be open to serious question." *State v. Leclair,* 385 A.2d 831, 833 (N.H. 1978). Because a witness can be influenced by the suggestive procedure itself, a court cannot know exactly how reliable the identification would have been without the suggestiveness.

¶ 32.   It is now clear to us that the use of unnecessarily suggestive evidence resulting from a showup procedure presents serious problems in Wisconsin criminal law cases.[8] Justice Thurgood Marshall, dissenting in *Brathwaite,* took note of such a problem and expressed his concern when he wrote:

> In my view, this conclusion totally ignores the lessons of *Wade.* The dangers of mistaken identification are, as *Stovall* held, simply too great to permit unnecessarily

---

[8] One commentator stated:

Unnecessarily suggestive pretrial identification procedures differ from most other improper law enforcement activities because they do not further any valid law enforcement interest. Although a violation of a suspect's fourth or fifth amendment rights—for example, a warrantless search or an interrogation without a lawyer present—is plainly wrong, it might at least further the valid law enforcement objective of collecting relevant evidence. By contrast, an unnecessarily suggestive identification procedure simply creates unreliable evidence where reliable evidence could have been gathered. It is not a case where good ends justify bad means—the end result of an unnecessarily suggestive procedure is worthless precisely because of the means used.

Rosenburg, *Rethinking the Right to Due Process,* 79 Ky. L.J. at 291 (footnote omitted).

suggestive identifications. Neither *Biggers* nor the Court's opinion today points to any contrary empirical evidence. Studies since *Wade* have only reinforced the validity of its assessment of the dangers of identification testimony. While the Court is 'content to rely on the good sense and judgment of American juries,' the impetus for *Stovall* and *Wade* was repeated miscarriages of justice resulting from juries' willingness to credit inaccurate eyewitness testimony.

*Brathwaite*, 432 U.S. at 125–26 (Marshall, J., dissenting) (footnote omitted) (citation omitted). We agree with him that many of the concerns regarding unnecessarily suggestive procedures were addressed in *Stovall* and *Wade*. *Stovall* recognized that the risk of misidentification is too great to allow the jury to hear evidence from unnecessarily suggestive showup procedures. As stated, the United States Supreme Court specifically held that the "practice of showing suspects singly to persons for the purpose of identification . . . has been widely condemned." *Stovall*, 388 U.S. at 302 (footnote omitted). While the Court allowed the showup evidence to be admitted in that case, its holding was limited to situations where, based on the totality of the circumstances, the showup was necessary. Such a strict requirement helped ensure that the police would take precautions when considering the use of a showup and, if a showup was appropriate, conduct the procedure in a non-suggestive manner.

¶ 33.   With *Stovall* as our guide, we now adopt a different test in Wisconsin regarding the admissibility of showup identifications.[9] We conclude that evidence

---

[9] As a result of our return to the United States Supreme Court's *Stovall* approach, we now withdraw any language in

obtained from an out-of-court showup is inherently suggestive and will not be admissible unless, based on the totality of the circumstances, the procedure was necessary. A showup will not be necessary, however, unless the police lacked probable cause to make an arrest or, as a result of other exigent circumstances, could not have conducted a lineup or photo array. A lineup or photo array is generally fairer than a showup, because it distributes the probability of identification among the number of persons arrayed, thus reducing the risk of a misidentification. *See* Richard Gonzalez et al., *Response Biases in Lineups and Showups,* 64 J. of Personality & Soc. Psych. 525, 527 (1993). In a showup, however, the only option for the witness is to decide whether to identify the suspect.[10] *See id.*

---

*Wolverton,* 193 Wis. 2d at 533, in *State v. Streich,* 87 Wis. 2d 209, 274 N.W.2d 635 (1979), as well as in the court of appeals' decision in *State v. Kaelin,* 196 Wis. 2d 1, 538 N.W.2d 538 (Ct. App. 1995), and in cases cited therein, that might be interpreted as being based on the Wisconsin Constitution. Those cases were based on the United States Constitution and focused more on the reliability of the identification than on the necessity for a showup.

In Wisconsin, there are several criteria that should be considered in regard to whether to adhere to precedent. *See Johnson Controls, Inc. v. Employers Ins.,* 2003 WI 108, 264 Wis. 2d 60, 665 N.W.2d 257. One such factor relates to the need to reach a decision that corresponds to newly ascertained facts. *Id.,* ¶ 98. Another factor is whether the prior decisions have become unsound, because they are based on principles that are no longer valid. *Id.,* ¶ 99. We conclude, in light of the compelling research discussed herein, that these criteria have now been satisfied.

[10] " 'There is a great potential for misidentification when a witness identifies a stranger based solely upon a single brief observation, and this risk is increased when the observation was made at a time of stress or excitement.' " *State v. Cromedy,* 727 A.2d 457, 463 (N.J. 1999) (citation omitted).

¶ 34. We emphasize that our approach, which is based to some extent on the recommendations of the Wisconsin Innocence Project, is not a per se exclusionary rule like Dubose requests. Showups have been a useful instrument in investigating and prosecuting criminal cases, and there will continue to be circumstances in which such a procedure is necessary and appropriate.[11]

¶ 35. If and when the police determine that a showup is necessary, special care must be taken to minimize potential suggestiveness. We recommend procedures similar to those proposed by the Wisconsin Innocence Project to help make showup identifications as non-suggestive as possible. For example, it is important that showups are not conducted in locations, or in a manner, that implicitly conveys to the witness that the suspect is guilty. Showups conducted in police stations, squad cars, or with the suspect in handcuffs that are visible to any witness, all carry with them inferences of guilt, and thus should be considered suggestive.[12] Next, officers investigating the matter at issue should proceed with caution in instructing the witness. The investigators must realize that "a witness's memory of an event can be fragile and that the amount and accuracy of the information obtained from a wit-

---

[11] An example of this would be when the police apprehend a suspect during a *Terry* stop. If that person is suspected of committing a crime, but the police do not have the requisite probable cause to arrest and then to conduct a lineup or photo array, a showup could be considered necessary.

[12] If a suspect is detained within the police station, logic dictates that the identification procedure should be a lineup or photo array, rather than the inherently suggestive showup.

ness depends in part on the method of questioning." United States Department of Justice, *Eyewitness Evidence,* at 3–4. Therefore, an eyewitness should be told that the real suspect may or may not be present, and that the investigation will continue regardless of the result of the impending identification procedure. Finally, it is important that a suspect be shown to the witness only once. If a suspect is identified, the police have no reason to conduct further identification procedures. Conversely, if the suspect is not identified by the witness, he or she should not be presented to that witness in any subsequent showups. While this list is far from complete, a showup conducted in accord with these standards will do much to alleviate the inherent suggestiveness of the procedure.

¶ 36. Applying this approach to the facts before us, it is clear that the showups conducted were unnecessarily suggestive, and that the admission of identification evidence denied Dubose a right to due process under Article I, Section 8 of the Wisconsin Constitution. First, there existed sufficient facts at the time of Dubose's arrest to establish probable cause for his arrest.[13] It was not necessary for the police to conduct the showups, since they had sufficient evidence against Dubose to arrest him without such showups.[14] Next, the officers handcuffed Dubose and placed him in the back seat of a squad car. By placing a suspect in a squad

[13] We have held that " '[p]robable cause to arrest refers to that quantum of evidence which would lead a reasonable police officer to believe that the defendant probably committed a crime.' " *State v. Koch,* 175 Wis. 2d 684, 701, 499 N.W.2d 152 (1993) (citation omitted).

[14] In *State v. Dubose,* 2003AP1690–CR, unpublished slip op., ¶ 26 (Wis. Ct. App. March 2, 2004), the court of appeals

car, the police implicitly suggest that they believe the suspect is the offender. This is similar to the situation in *Stovall*, where the United States Supreme Court held that the showup procedure was suggestive when the defendant was brought into the hospital room in handcuffs and accompanied by police officers and prosecutors. Third, the police officers told the witness, Hiltsley, that they may have caught "one of the guys" who had robbed him. Such a comment is suggestive and, as studies have shown, greatly increases the chance of

held that, based on the totality of the circumstances, there was sufficient probable cause to arrest Dubose. It relied on the following facts:

> First, the entirety of the events occurred in the early morning hours when there were few people out on the streets. See State v. Flynn, 92 Wis. 2d 427, 447, 285 N.W.2d 710 (1979) (time of day is a relevant factor). Second, Engelbrecht noticed two people in the very near vicinity of the burglary call, about a block and a half away, shortly after the call was made. Third, because one of the individuals wore a flannel shirt with a hood, they matched the description given in connection with the burglary call. Fourth, the then suspects ran away from Engelbrecht after he turned his vehicle in their direction. See Illinois v. Wardlow, 528 U.S. 119, 124–25 (2000) (flight from the police, although not dispositive, can be a relevant factor). Fifth, within a minute and a half, Engelbrecht set up a one-block perimeter to lock-down the area. Sixth, while waiting for the canine unit to arrive, Engelbrecht heard a dispatch regarding an armed robbery involving two African-American male suspects. Dispatch further advised this call may be related to the earlier burglary call. Seventh, Rocky, the canine partner, immediately picked up the scent of the suspects who ran away from Engelbrecht and ultimately tracked Dubose to a location that was within the officers' one-block perimeter. Eighth, Dubose was hiding in someone's backyard behind a fence. Ninth, after being told to come out, Dubose, an African-American male, appeared and fit the description from the armed robbery dispatch. The sum total of these events constitutes probable cause.

*Id.* We wholeheartedly agree with this analysis by the court of appeals.

misidentification.[15] Although the court of appeals stated that it found "nothing wrong with a police procedure where officers indicate an individual is a possible suspect," *Dubose,* 2003AP1690–CR, unpublished slip op. at ¶ 33, we consider such a comment unnecessarily suggestive.

¶ 37. Finally, after the first showup was conducted and Dubose was positively identified, the police still conducted two more identification procedures, another showup and a photo of Dubose, at the police station shortly after Dubose's arrival. These subsequent identification procedures were unnecessarily suggestive. Dubose had already been arrested and positively identified by Hiltsley. The record does not show that any exigent circumstances existed making the out-of-court identification procedures used here necessary. Therefore, we conclude, based on the totality of the circumstances, that "[t]he suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify [the defendant] whether or not he was in fact 'the man.' In effect, the police repeatedly said to the witness 'This is the man.' " *Foster v. California,* 394 U.S. 440, 443 (1969) (citation omitted). For similar reasons, as discussed above, we reverse the court of appeals and remand this case to the circuit court for further proceedings, consistent with the standards adopted herein. While our focus is on the two showups that occurred here, the photo identification by showing Hiltsley a mug shot of Dubose, was also

---

[15] Studies have demonstrated that giving a proper instruction can reduce mistaken identification rates by as much as 41 percent without affecting the rate of accurate identifications. *See* Gary L. Wells & Elizabeth A. Olson, *Eyewitness Testimony,* 54 Ann. Rev. Pscyh. 277, 286–87 (2003).

unnecessarily suggestive and that out-of-court identification should have been suppressed.

¶ 38.   On remand, we recognize that the exclusion of evidence of the out-of-court identifications "does not deprive the prosecutor of reliable evidence of guilt. The witness would still be permitted to identify the defendant in court if that identification is based on an independent source. And properly conducted pretrial viewings can still be proven at trial and, would be encouraged by the rule prohibiting use of suggestive ones." *People v. Adams,* 423 N.E.2d 379, 384 (N.Y. 1981). In this case, we do not now vacate the circuit court's judgment of conviction, since the circuit court must review any identification of Dubose made by a witness during the trial. If the court determines that any such identification was based on the unnecessarily suggestive showups and the photo identification, then the conviction must be set aside and a new trial ordered, unless any in-court identification was independent or untainted. The court may uphold any in-court identification if the circuit court determines that it "had an origin independent of the lineup or was 'sufficiently distinguishable to be purged of the primary taint.' " *State v. McMorris,* 213 Wis. 2d 156, 175, 570 N.W.2d 384 (1997) (quoting *Wade,* 388 U.S. at 241). In other words, if the circuit court determines that any in-court identification of Dubose was not tainted by out-of-court identifications, then the conviction should stand. "[T]he in-court identification is admissible if the State carries the burden of showing 'by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the [out-of-court] identification.' " *McMorris,* 213 Wis. 2d at 167 (quoting *Wade,* 388 U.S. at 240.

171

## V

¶ 39. We find strong support for the adoption of these standards in the Due Process Clause of the Wisconsin Constitution, Article I, Section 8.[16] It reads in relevant part: "No person may be held to answer for a criminal offense without due process of law. . . ."[17] Based on our reading of that clause, and keeping in mind the principles discussed herein, the approach outlined in *Biggers* and *Brathwaite* does not satisfy this requirement. We conclude instead that Article I, Section 8 necessitates the application of the approach we are now adopting,[18] which is a return to the principles enunciated by the United States Supreme Court's decisions in *Stovall, Wade,* and *Gilbert.*

---

[16] While we recognize that Article I, Section 1 of the Wisconsin Constitution also refers to principles of due process, the relevant provision of the Wisconsin Constitution at issue in this case, as noted in the arguments in the briefs of counsel, is Article I, Section 8. As a result, case law discussing Article I, Section 1 of the Wisconsin Constitution is not relevant to this present inquiry.

[17] The Fourteenth Amendment to the United States Constitution states:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

[18] We note that "the Federal Constitution does not foreclose experimentation by the States in the development of such rules." *Brathwaite,* 432 U.S. at 118 (Stevens, J., concurring); *see also Iowa v. Tovar,* 541 U.S. 77, 94 (2004) (The Court recently decided this case exclusively under the Federal Constitution and noted "that states are free to adopt by statute, rule, or decision any guides . . . they deem useful.").

¶ 40. The State concedes in its brief that this court has never interpreted Article I, Section 8 of the Wisconsin Constitution as equivalent to the Due Process Clause of the United States Constitution in regard to pretrial identification. The State does argue, however, that on issues other than pretrial identification, we have stated that the provisions are essentially equivalent, and that we should interpret them identically here. However, we are not required to interpret the Due Process Clause of Article I, Section 8 of the Wisconsin Constitution in lock-step with the Federal Constitution. *See State v. Ward,* 2000 WI 3, ¶ 59, 231 Wis. 2d 723, 604 N.W.2d 517 ("[I]t would be a sad irony for this court to . . . act as mere rubber stamps ourselves when interpreting our Wisconsin Constitution."); *State v. Knapp,* 2005 WI 127, ¶ 60, 285 Wis. 2d 86, 700 N.W.2d 899 (*Knapp II*) ("While textual similarity or identity is important when determining when to depart from federal constitutional jurisprudence, it cannot be conclusive, lest this court forfeit its power to interpret its own constitution to the federal judiciary. The people of this state shaped our constitution, and it is our solemn responsibility to interpret it.") (citation omitted).

¶ 41. Even though the Due Process Clause of Article I, Section 8 of the Wisconsin Constitution uses language that is somewhat similar, but not identical, to the Due Process Clause of the Fourteenth Amendment to the United States Constitution, we retain the right to interpret our constitution to provide greater protections than its federal counterpart. *See Knapp II,* 285 Wis. 2d 86, ¶ 59; *State v. Hansford,* 219 Wis. 2d 226, 242, 580 N.W.2d 171 (1998); *State v. Doe,* 78 Wis. 2d 161, 171–72, 254 N.W.2d 210 (1977); *Hoyer v. State,* 180 Wis.

407 (1923); *Carpenter v. County of Dane,* 9 Wis. 249, [\*274] (1859). " '[W]hile this results in a divergence of meaning between words which are the same in both federal and state constitutions, the system of federalism envisaged by the United States Constitution tolerates such divergence where the result is greater protection of individual rights under state law than under federal law. . . .' " William J. Brennan, Jr., *State Constitutions and the Protection of Individual Rights,* 90 Harv. L. Rev. 489, 500 (1977) (quoting *State v. Kaluna,* 520 P.2d 51, 58 n.6 (Haw. 1974)).[19]

¶ 42. We gain support for our reliance on the Wisconsin Constitution by noting that the federal standard in out-of-court eyewitness identifications has also not been accepted, on state constitutional grounds, in two prominent states—New York and Massachusetts. *See Johnson,* 650 N.E.2d at 1257; *Adams,* 423 N.E.2d at 379.[20] Although these states have adopted a per se

---

[19] We recognize that experimentation in state courts serves to guide the United States Supreme Court in its determinations. *See* Shirley S. Abrahamson, *Reincarnation of State Courts,* 36 Sw. L.J. 951, 966 (1982). Thus, "a state can be innovative within its own borders without involving the entire nation. State courts have greater latitude in devising remedies that respond to local concerns. Indeed, state judicial review may be said to foster the values of federalism by allowing the nation to profit by using what succeeds in a state and avoiding what fails." Shirley S. Abrahamson, *State Constitutional Law, New Judicial Federalism, and the Rehnquist Court,* 51 Clev. St. L. Rev. 339, 347 (2004) (footnote omitted).

Likewise, we fully expect that our experimentation with this test will be successful in Wisconsin and later adopted elsewhere.

[20] In *People v. Adams,* 423 N.E. 2d 379, 383 (N.Y. 1981), the New York Court of Appeals justified its reliance on its state constitution in the following passage:

exclusionary rule under their respective state constitutions, and thus provide a different approach than this court, we recognize nevertheless that Wisconsin does not stand alone on out-of-court identification issues.

¶ 43. We also recognize that this case is not the first to result in a change in principles based on extensive new studies completed after a court decision that was premised on constitutional interpretation and application. For example, in *Brown v. Board of Education*, 347 U.S. 483 (1954), the United States Supreme Court relied on comprehensive studies to support its legal conclusion that the doctrine of separate but equal was violative of the United States Constitution and, thus, that *Plessy v. Ferguson*, 163 U.S. 537 (1896) should be overruled. For support of this much-needed shift in constitutional law, the United States Supreme Court based its decision on several modern studies and on the effects of segregation in public education.[21] The

---

In the past Federal constitutional guarantees, as interpreted by the Supreme Court, generally satisfied and often exceeded the requirements of comparable provisions of the State Constitution. But there would be no need for an independent State Bill of Rights if that were always the case. In recent years particularly the Supreme Court has emphasized and encouraged this and related aspects of Federalism by exercising special restraint in prescribing constitutional rules of procedure which would displace or foreclose development of State rules specifically tailored to local problems and experiences. . . .

*Id.* (citations omitted).

[21] "The Court simply cited the studies seriatim in a footnote, much as it would list case citations supporting a proposition of law." John Monahan & Laurens Walker, *Social Authority: Obtaining, Evaluating and Establishing Social Science in Law*, 134 U. Pa. L. Rev. 477, 483–84 (1986) (footnote omitted). Thus, the decision in *Brown v. Board of Education*, 347 U.S. 483 (1954) is a "prototypical example of an appellate court using

Court stated: "[W]e cannot turn the clock back to 1868 when the Amendment was adopted, or even to 1896 when *Plessy v. Ferguson* was written. We must consider public education in the light of its full development and its present place in American life throughout the Nation." *Brown*, 347 U.S. at 492–93.

¶ 44.   In agreeing with the position that "Negro children, as a class, receiv(e) educational opportunities which are substantially inferior to those available to white children otherwise similarly situated," *id.* at 494 n.10 (quoting *Belton v. Gebhart*, 87 A.2d 862, 865 (Del. Ch. 1952)), the United States Supreme Court based its holding on "modern authority." *Id.* at 494. Because we also base our decision, in part, on "modern authority," we have no trouble following the lead of *Brown* and making a much-needed change to our jurisprudence based on the application of the Due Process Clause of Article I, Section 8 of the Wisconsin Constitution.[22]

## VI

¶ 45.   In sum, we agree with Dubose that the circuit court erred in denying his motion to suppress the out-of-court identification evidence. However, we decline to adopt his proposed per se exclusionary rule regarding such evidence. Instead, we adopt standards for the admissibility of out-of-court identification evi-

modern social and behavioral sciences as legislative evidence to support its choice of a rule of law." *Cromedy*, 727 A.2d 457 at 463 (citation omitted).

[22] For a more recent example of current studies influencing a shift in constitutional principle, *see Roper v. Simmons,* 125 S. Ct. 1183 (2005) (The United States Supreme Court held, based largely on current evidence, that the execution of minors is prohibited by the Eighth and Fourteenth Amendments of the United States Constitution).

dence similar to those set forth in the United States Supreme Court's decision in *Stovall*. We hold that evidence obtained from such a showup will not be admissible unless, based on the totality of the circumstances, the showup was necessary. A showup will not be necessary, however, unless the police lacked probable cause to make an arrest or, as a result of other exigent circumstances, could not have conducted a lineup or photo array. Since the motion to suppress the out-of-court identifications of Dubose should have been granted here, because such identifications were unnecessarily suggestive, we reverse the decision of the court of appeals, and remand the case to the circuit court for further proceedings consistent with the standards adopted herein.

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court.

¶ 46.   LOUIS B. BUTLER, JR., J. (*concurring*). I join the majority opinion in all respects. I write separately to respond to the concerns raised by one of the dissenting opinions. *See* Roggensack, J., dissenting.

¶ 47.   I agree with Justice Roggensack that with respect to identification testimony in criminal trials, reliability *should* be the key to admissibility. Roggensack, J., dissenting, ¶ 79. I also agree that a criminal defendant is denied due process when identification testimony admitted at trial from a showup is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Roggensack, J., dissenting, ¶ 82 (citing *State v. Wolverton,* 193 Wis. 2d 234, 264, 533 N.W.2d 167 (1995); *Simmons v. United States,* 390 U.S. 377, 384 (1968)). Finally, I agree that we should not impede "the presentation of reliable, relevant evidence at trial." Roggensack, J., dissenting,

177

¶ 86. However, I part ways with the dissent precisely because showup identifications have been shown to be unreliable, thereby undercutting the legal fiction that we have operated under with respect to eyewitness testimony.

¶ 48.   Some of the very research relied upon by the dissent to illustrate the "disagreements about the unreliability of showups" (Roggensack, J., dissenting, ¶ 90) sets forth an overall accuracy rate of 69 percent for showups, compared to 51 percent for lineups. *Id.* (citing Nancy Steblay, et al., *Eyewitness Accuracy Rates in Police Showup and Lineup Presentations:   A Meta-Analytic Comparison,* 27 Law and Human Behavior 523, 535 (2003)). Although not mentioned by the dissent, that research further indicates that when the target is in the display, a correct identification occurs only 47 percent of the time in showups, compared to 45 percent of the time in lineups. Steblay at 530. Moreover, when the target is not in the display, a false identification of an innocent suspect (minus foil Ids) occurs 23 percent of the time in showups, as opposed to 17 percent of the time in lineups. *Id.*

¶ 49.   This is not "disputed social science theory." Roggensack, J., dissenting, ¶ 79. This is data relied upon by the dissent. *Id., ¶* 90. What we are dealing with is a serious failure rate with respect to eyewitness identifications. Whether we are looking at the dissent's failure rate for showups of 53 percent, 31 percent, 23 percent, or 16 percent, that rate is simply unacceptable. Steblay, at 530, 532–33, 535. *See also* Roggensack, J., dissenting, ¶ 90. The dissent cannot seriously argue that any of these statistical misidentification rates lead to the conclusion that eyewitness identifications are inherently reliable. What we have here is a legal fiction that is simply not borne out by the facts. Unless, and

178

until, we improve eyewitness identification procedures so that the likelihood of irreparable misidentification is significantly reduced, we can no longer proceed as though all is good in the Land of Oz.

¶ 50. All of this does not mean that eyewitness testimony cannot be a valuable piece of evidence in a criminal trial. Showups will continue to be used where necessary and appropriate. Majority op., ¶ 34. The goal of the majority's opinion, in my view, is to avoid a very substantial likelihood of irreparable misidentification. *Id.*, ¶ 35.

¶ 51. The reasons supporting our approach should be readily apparent. If the wrong person is incorrectly identified, an innocent person faces potential prosecution, incarceration, and conviction.[1] More

---

[1] A basic tenet of our criminal justice system is that it is better that ten guilty persons go free than that one innocent person is convicted. *See* 4 W. Blackstone, *Commentaries on the Laws of England* (1769) c. 27, p. 352; *see also Furman v. Georgia,* 408 U.S. 238, 367 n.158 (1972) (Marshall, J., concurring) ("It is better for ten guilty people to be set free than for one innocent man to be unjustly imprisoned.") (quoting William O. Douglas, Foreword to Jerome Frank & Barbara Frank, Not Guilty 11–12 (1957)); *In re Winship,* 397 U.S. 358, 372 (1970) (Harlan, J., concurring) ("It is far worse to convict an innocent man than to let a guilty man go free.")). While the majority relies on *Brown v. Board of Education,* 347 U.S. 483 (1954), I fail to see how the majority "trades on *Brown*'s prestigious position in American jurisprudence to support the majority opinion's reliance on a disputed social science theory." *See* Roggensack, J., dissenting, ¶ 93. Just as the High Court sought to root out the unjust doctrine of "separate but equal" in *Brown,* we seek to root out unjust convictions based on mistaken identifications. The principle is the same: if we see the error of our ways, we are duty-bound to correct that error. That, I discern, is the point of the majority's analogy.

important, however, is the fact that the guilty perpetrator remains at large, able to wreak havoc upon an unsuspecting populace. *See* Tom Kertscher, *Wrongly Convicted Man Freed,* Milwaukee Journal Sentinel Online, available at http://www.jsonline.com/news/state/sep03/169169.asp. No one wants that. I therefore join the majority opinion in this matter.

¶ 52. For the foregoing reasons, I respectfully concur.

¶ 53. I am authorized to state that Justice N. PATRICK CROOKS joins this concurrence.

¶ 54. JON P. WILCOX, J. (*dissenting*). I agree with Justice Roggensack that if a constitution is to mean anything, its principles must not be subject to change based on the prevailing winds of the time. *See* Justice Roggensack's dissent, ¶ 80.

¶ 55. The Fourteenth Amendment to the United States Constitution provides, in relevant part: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The Wisconsin equivalent of the Federal Due Process Clause, Article I, Section 8 of the Wisconsin Constitution, provides, in relevant part: "No person may be held to answer for a criminal offense without due process of law[.] Both clauses are virtually identical.[1]

---

[1] Wisconsin courts have also recognized a co-extensive due process right originating from Article I, Section 1 of the Wisconsin Constitution, which provides: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." *See Reginald D.*

¶ 56. Seven years ago, the author of today's majority opinion recognized: "This court has *repeatedly stated* that the due process clauses of the state and federal constitutions are essentially equivalent and are subject to identical interpretation." *State v. Hezzie R.,* 219 Wis. 2d 848, 891, 580 N.W.2d 660 (1998)(emphasis added). *See also State v. Harris,* 2004 WI 64, ¶ 2 n.1, 272 Wis. 2d 80, 680 N.W.2d 737 (accord); *County of Kenosha v. C & S Mgmt., Inc.,* 223 Wis. 2d 373, 393, 588 N.W.2d 236 (1999) ("On more than a few occasions we have expressly held that the due process and equal protection clauses of our state constitution and the United States Constitution are essentially the same[.]"); *State v. Greenwold,* 189 Wis. 2d 59, 71, 525 N.W.2d 294 (Ct. App. 1994) ("[I]t is well established that the due process clause of the Wisconsin Constitution is the substantial equivalent of its respective clause in the federal constitution.").

¶ 57. Likewise, in *Thorp v. Town of Lebanon,* 2000 WI 60, ¶ 35 n.11, 235 Wis. 2d 610, 612 N.W.2d 59, this court ruled:

> We treat the Thorps' claims under the federal Constitution consistently with their claims under the state constitution because ordinarily there is no discernible difference in intent between the Equal Protection and Due Process Clauses under the Wisconsin Constitution and the United States Constitution. *Compare* U.S. Const. amend. XIV *with* Wis. Const. art. I, §§ 1, 8. *State v. Agnello,* 226 Wis. 2d 164, 180–81, 593 N.W.2d 427 (1999) (stating that "[w]here . . . the language of the provision in the state constitution is

*v. State,* 193 Wis. 2d 299, 306–07, 533 N.W.2d 181 (1995); *State v. McManus,* 152 Wis. 2d 113, 130, 447 N.W.2d 654 (1989); *State ex rel. Sonneborn v. Sylvester,* 26 Wis. 2d 43, 49–50, 132 N.W.2d 249 (1965).

'virtually identical' to that of the federal provision or where no difference in intent is discernible, Wisconsin courts have normally construed the state constitution consistent with the United States Supreme Court's construction of the federal constitution") (citing *State v. Tompkins,* 144 Wis. 2d 116, 133, 423 N.W.2d 823 (1988)).

¶ 58.   In sum, our decisions have recognized that because the language of the two provisions is almost identical, there is simply no basis to conclude that the drafters of the Wisconsin Constitution intended our Due Process Clause to mean anything different than its federal analogue. Furthermore, this court has repeatedly recognized that the unwritten due process protection in Article I, Section 1 of the Wisconsin Constitution is the same as that accorded under the Fourteenth Amendment to the United States Constitution.

¶ 59.   As this court explained in *Reginald D. v. State,* 193 Wis. 2d 299, 306–07, 533 N.W.2d 181 (1995):

> The Fourteenth Amendment to the United States Constitution provides "nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." The functional equivalent of this clause is found in Article I, sec. 1, of the Wisconsin Constitution: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." As noted in *State ex rel. Sonneborn v. Sylvester,* 26 Wis. 2d 43, 49–50, 132 N.W.2d 249 (1965), even though Article I, sec. 1, is based on the Declaration of Independence, "there is no substantial difference" between its equal protection and due process protections and that of the Fourteenth Amendment." *See also*

[*State v. McManus,* 152 Wis. 2d 113, 130, 447 N.W.2d 654 (1989)] ("This court has held that the due process and equal protection clauses of the Wisconsin Constitution are substantial equivalents of their respective clauses in the federal constitution); *Funk v. Wollin Silo & Equipment, Inc.,* 148 Wis. 2d 59, 61 n.2, 435 N.W.2d 244 (1989) ("We have given the equal-protection provision of the Wisconsin Constitution and the parallel clause of the United States Constitution identical interpretation.").

¶ 60.  The legitimacy of this parallel interpretation of the due process clauses of the Wisconsin Constitution and the federal constitution has been recognized by this court throughout Wisconsin's history. As this court discussed in *Sonneborn,* 26 Wis. 2d at 49–50:

> Preliminarily, we point out that sec. 1, art. I of the Wisconsin constitution is framed in language of a Declaration of Rights and reminiscent of the Declaration of Independence, and many times has been held to be substantially equivalent of the due-process and the equal-protection clauses of the Fourteenth amendment to the United States constitution. In *Black v. State* (1902), 113 Wis. 205, 89 N.W. 522, the court said that the section must mean "equality before the law, if it means anything," and, "The idea is expressed more happily in the Fourteenth amendment." Again, in *Pauly v. Keebler* (1921), 175 Wis. 428, 185 N.W. 554, it was said in referring to the Fourteenth amendment that the first article of the Declaration of Rights in our constitution was a substantially equivalent limitation of legislative power and "our legislature is bound to accord all persons within its jurisdiction the equal protection of the laws." More recently we reaffirmed the concept that sec. 1, art. I, is to be equated with the Fourteenth amendment in *Boden v. Milwaukee* (1959), 8 Wis. 2d 318, 99 N.W.2d 156; *Lathrop v. Donohue* (1960), 10 Wis. 2d 230, 102 N.W.2d 404; and *Haase v. Sawicki* (1963),

183

20 Wis. 2d 308, 121 N.W.2d 876. Since there is no substantial difference between the two constitutions, we will henceforth refer only to the Fourteenth amendment of the United States constitution.

¶ 61. Today the majority alters course and abandons this long line of well-established precedent, contending that the Due Process Clause of the Wisconsin Constitution now affords greater protections than its federal counterpart. In doing so, the majority provides no legal justification for its decision other than its raw power to do so. *See* majority op., ¶ 40. The majority even recognizes that as a result, the exact same words in the federal and state constitutions now mean different things according to this court. *Id.*, ¶ 41. Yet, the majority fails to articulate a rationale for how identical language in the two documents can mean the same thing for a number of years and now suddenly mean something different. Simply stating that a majority of the court disagrees with a United States Supreme Court decision and has the power to construe our state constitution more broadly is not a principled basis for suddenly rejecting our long history of interpreting the due process clauses of the federal and state constitutions in concert.

¶ 62. Given the nearly identical language in the two provisions and this court's historic practice of interpreting the two provisions in the same fashion, the majority simply has no support for its conclusion that the language in Article I, Section 8 "necessitates" a rejection of the United States Supreme Court's opinions in *Neil v. Biggers,* 409 U.S. 188 (1972), and *Manson v. Brathwaite,* 432 U.S. 98 (1977), and that the these opinions "do[ ] not satisfy" the requirements of Wisconsin's due process clause. Majority op., ¶ 39.

184

¶ 63. The majority thus has no legal basis for its conclusion that Article I, Section 8 of the Wisconsin Constitution *requires* a radical change in our law governing showups. Simply put, Article I, Section 8 "necessitates" the rule announced by the court only because a majority of justices on this court wills it to be so. Thus, I agree with Justice Roggensack that "[t]he rule of law announced today is not based on constitutional principle." Justice Roggensack's dissent, ¶ 87.

¶ 64. This is the second time this term this court has abandoned our practice of interpreting similarly worded provisions of the state and federal constitutions in concert. In *State v. Knapp,* 2005 WI 127, 285 Wis. 2d 86, 700 N.W.2d 899, this court abandoned our previous jurisprudence holding that Article I, Section 8 of the Wisconsin Constitution does not create broader rights than those provided by the Fifth Amendment of the United States Constitution. Thus, a majority of this court has not only twice unjustifiably rejected the strictures of stare decisis, but it has needlessly called in question countless opinions of this court that have relied on a parallel interpretation of the Wisconsin and federal constitutions.

¶ 65. Furthermore, I, *too,* am troubled by the majority's reliance on recent social science "studies," majority op., ¶¶ 29–30, presented by advocacy groups, to justify its departure from stare decisis. Not only is such data disputed, as recognized by Justice Roggensack, *see* Justice Roggensack's dissent, ¶¶ 89–91, but, more importantly, it is not a valid basis to determine the meaning of our constitution. The majority fails to adequately explain how the meaning of the text of the constitution can change every time a new series of

social science "studies" is presented to the court.[2] If the text is so fluid, then our constitution is no constitution at all, merely a device to be invoked whenever four members of this court wish to change the law.

¶ 66.  It is not the function of this court to create what it considers to be good social policy based on data from social science "studies." That is the province of the legislature. Our task is to render decisions based on legal principles and constitutional authority. *See Panzer v. Doyle,* 2004 WI 52, ¶ 39, 271 Wis. 2d 295, 680 N.W.2d 666.

¶ 67.  There must be consistency in our jurisprudence if our decisions are to have any semblance as law and not simply the unfettered will of a majority of the members of this court. Because I agree that "constitutional principles are not to change depending on what social science theory is in fashion[,]" Justice Roggensack's dissent, ¶ 80, and because the mere ability of the court to construe the Due Process Clause of the state constitution more broadly than its federal counterpart does not justify the majority's decision to abandon our history of according both provisions an identical interpretation, I dissent.

¶ 68.  DAVID T. PROSSER, J. *(dissenting).* Nothing in the facts of this case justifies the precipitous departure from state and federal precedent the majority undertakes.

¶ 69.  As in any case, the facts are critical. After committing an armed robbery against Timothy Hiltsley, two men fled from Hiltsley's residence in Green Bay. A

---

[2] This is the second time this term that a majority of the court has utilized "studies" and "data" to alter the meaning of our constitution. *See generally Ferndon v. Wisconsin Patients Compensation Fund,* 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440.

few minutes later, at about 1:21 A.M., a neighbor called the police to report the two men fleeing the scene. Police officers arrived immediately, and one of the responding officers observed two men walking near the apartment. When the officer turned his vehicle around to investigate, the men fled between two houses, into the middle of a residential block.

¶ 70.    The police *immediately* set up a perimeter around the block. By all accounts, this took less than 90 seconds. Upon searching the area, the police quickly discovered Dubose. The officers placed Dubose in the back of a squad car and drove him to Hiltsley's location, where they conducted a showup. Hiltsley immediately identified Dubose as the man who robbed him at gunpoint, mentioning that he recognized Dubose due to his build and hairstyle.

¶ 71.    All of this occurred within minutes after the robbery.

¶ 72.    Shortly thereafter, other officers located a semi-automatic pistol within the perimeter, near the houses where the two unidentified men ran after being pursued by the police.

¶ 73.    The majority opinion spends most of its energy discussing the studies it relies on to depart from state and federal precedent. It devotes only two paragraphs to the application of its theory to this case.[1]

¶ 74.    The facts in this case are not sufficient to justify the majority's conclusion that this defendant's due process rights were violated. Nothing in these facts is so inherently unfair or suggestive that it justifies this court-ordered sea change in the law.

¶ 75.    Throughout this term, the court has repeatedly used its raw power to interpret provisions in the

---

[1] Majority op., ¶¶ 36–37.

Wisconsin Constitution differently from the way the United States Supreme Court interprets provisions in the U.S. Constitution. While the court *may* exercise this power, the court should pay more attention to whether it *should* exercise this power.

¶ 76. By sheer volume of cases, the Supreme Court has developed substantial experience interpreting constitutional provisions. Matters reaching the Supreme Court are of such import that they are also likely to be better briefed and argued than issues in the state court system. When state courts adopt myriad different interpretations of state constitutions, the level of uncertainty rises exponentially. A suspect's constitutional rights may change dramatically depending on which side of a state line he robs an acquaintance.

¶ 77. It is apparent that the majority opinion is out of step not only with the United States Supreme Court, but also with most other state courts. It proudly proclaims as much. It is curious that a court so confident in the wisdom and superiority of its analysis should consistently attempt to insulate its decisions from review.

¶ 78. For the reasons stated, I respectfully dissent.

¶ 79. PATIENCE DRAKE ROGGENSACK, J. (*dissenting*). The majority concludes that its reading of the due process clause of Article I, Section 8 of the Wisconsin Constitution[1] now requires suppression of any identification obtained through a process known as a "showup"[2] unless it was necessary to make identifica-

---

[1] Article I, Section 8 provides in relevant part:

(1) No person may be held to answer for a criminal offense without due process of law . . . .

[2] A showup is the individual presentation of a suspect in the commission of a crime to a witness of that crime.

tion in that manner. Majority op., ¶ 2. By so concluding, the majority requires the suppression of identifications of defendants charged with crimes, no matter how reliable the identification. This holding substitutes a search for the truth, which should form the foundation for every criminal prosecution, with one social science theory that showup identifications are "unnecessarily suggestive." *Id.* In so doing, the majority opinion abandons our previous jurisprudence and the United States Supreme Court's jurisprudence concerning showup identifications, both of which have used the reliability of the identification as the linchpin for determining admissibility. I dissent because reliability, and not a disputed social science theory, must be the key to admissibility of all identification testimony in criminal trials and because I conclude that the totality of circumstances bearing on the identification in this case resulted in a reliable identification of Dubose as the perpetrator of the armed robbery of which he was convicted. Accordingly, I would affirm the court of appeals.

¶ 80. The term "due process of law" comes from the Magna Carta's promise of a trial directed by the "law of the land" as established by the legislative body of government. *Stovall v. Denno,* 388 U.S. 293, 305 (1967) (Black, J., dissenting). One of the four paintings in the Wisconsin Supreme Court hearing room depicts the signing of the Magna Carta. And though many of the Magna Carta's provisions were subsequently repealed, my understanding is that the subject of the painting was chosen because of the significance of the foundational principle of due process that the Magna Carta promised in 1215 and that Wisconsin courts were to preserve. I note this because constitutional principles are not to change depending on what social science theory is in fashion.

¶ 81. The United States Supreme Court addressed constitutional due process in the context of a showup eyewitness identification in *Stovall*. It held that a claim to suppress an out-of-court identification implicates a defendant's constitutional right to procedural due process. *Stovall*, 388 U.S. at 299. However, the United States Supreme Court also explained that blanket suppressions of identifications are not in keeping with the promotion of justice.

> The per se rule, however, goes too far since its application automatically and peremptorily, and without consideration of alleviating factors, keeps evidence from the jury that is reliable and relevant.

*Manson v. Brathwaite*, 432 U.S. 98, 112 (1977). And, as we have explained, " 'the admission of evidence of a showup without more does not violate due process.' " *State v. Streich*, 87 Wis. 2d 209, 214, 274 N.W.2d 635 (1979) (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)). We have also held that a one-to-one identification is not per se suggestive, and because such an identification is often done while the witness's memory is fresh, it actually promotes fairness by assuring reliability and preventing the holding of an innocent suspect. *Streich*, 87 Wis. 2d at 215–16 (citing *State v. Isham*, 70 Wis. 2d 718, 724–25, 235 N.W.2d 506 (1975); *see also Johnson v. State*, 47 Wis. 2d 13, 18, 176 N.W.2d 332 (1970).

¶ 82. Prior to today's ruling, Wisconsin courts have held that a criminal defendant was denied due process only when identification evidence admitted at trial stemmed from a showup that was " 'so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.' " *State v. Wolverton*, 193 Wis. 2d 234, 264, 533 N.W.2d 167 (1995)

(quoting *Simmons v. United States,* 390 U.S. 377, 384 (1968). "A criminal defendant [bore] the initial burden of demonstrating that a showup was impermissibly suggestive." *Wolverton,* 193 Wis. 2d at 264. If this burden was met, the State was required to prove that "under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive," using the following five factors:

> "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of his prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation."

*Wolverton,* 193 Wis. 2d at 264–65 (quoting *Brathwaite,* 432 U.S. at 114; *see also Biggers,* 409 U.S. at 199–200; *Powell v. State,* 86 Wis. 2d 51, 65, 271 N.W.2d 610 (1978). The court's examinations of all eyewitness identifications focused on reliability, because it is the absence of reliability that violates due process. *Stovall,* 388 U.S. at 301–02.

¶ 83. There are many factors that bear on whether an identification is reliable. Showup identifications that are done soon after the commission of the crime, while the appearance of the perpetrator is fresh in a witness's mind, have more reliability than identifications done after the passage of considerable time.[3] *Wolverton,* 193 Wis. 2d at 267; *State v. Russell,* 60 Wis. 2d 712, 721, 211 N.W.2d 637 (1973); *Johnson,* 47 Wis. 2d

---

[3] *See also State v. DiMaggio,* 49 Wis. 2d 565, 586, 182 N.W.2d 466 (1971) ("An immediate confrontation is inherently more reliable than a delayed one, while failure to identify terminates any inconvenience to the suspect."); *Turner v. United States,* 622 A.2d 667, 672 (D.C. App. 1993) ("[I]dentifi-

at 18. As we explained in *Johnson,* a "fresh identification" promotes fairness "by assuring reliability." *Id.* Additionally, showup identifications are done in-person, and corporeal identifications are generally held more reliable than photo identifications. *Simmons,* 390 U.S. at 386 n.6 (citing P. Wall, *Eye-Witness Identification in Criminal Cases* 83 (1965); Williams, *Identification Parades,* [1955] Crim. L. Rev. 525, 531).

¶ 84.  The majority opinion asserts that it is relying on *Stovall.* Majority op., ¶ 32. It contends that *Stovall* is "limited to situations where, based on the totality of the circumstances, the showup was necessary." Majority op., ¶ 32. This is a misreading of *Stovall* because there is nothing in *Stovall* that limits the use of showup identifications to those circumstances where that mode of identification was "necessary." Instead, *Stovall* defines its task as determining whether "the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." *Stovall,* 388 U.S. at 301–02. The United States Supreme Court then further explained, "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it." *Id.* at 302. Therefore, *Stovall* expressly focuses on the reliability of the identification, not on whether it was "necessary" to do a showup, as the majority opinion represents.

¶ 85.  The majority opinion also relies on *United States v. Wade,* 388 U.S. 218 (1967) and *Gilbert v. California,* 388 U.S. 263 (1967), which were decided the same day as *Stovall.* Majority op., ¶ 19. However, *Wade*

cations conducted soon after the crime enhance the accuracy of witnesses' identifications and allow innocent suspects to be quickly freed.").

and *Gilbert* are not due process cases. Instead, they are Sixth Amendment cases, where the United States Supreme Court concluded that post-indictment identifications could not be conducted without notice to and the presence of counsel. *Wade*, 388 U.S. at 219–21; *Gilbert*, 388 U.S. at 272. The concern in *Wade* and in *Gilbert* was the right to the assistance of counsel at all critical phases of a criminal prosecution, and the Court concluded that an identification conducted after indictment was a critical phase of a prosecution. *Wade*, 388 U.S. at 236–37; *Gilbert*, 388 U.S. at 272. The showup identification of Dubose was not a post-indictment identification, so *Wade* and *Gilbert* have no application.

¶ 86. By banning all showups unless there is a "necessity," the majority completely overrides one of the major tenets in the administration of justice: the presentation of reliable, relevant evidence at trial. *Brathwaite*, 432 U.S. at 112. The United States Supreme Court has reasoned that inflexible rules of exclusion may frustrate justice, rather than promote it. *Id.* at 113. I agree completely.

¶ 87. The rule of law announced today is not based on constitutional principle. This is demonstrated in part by the majority opinion's decision that if officers lack probable cause to arrest, then a showup is permissible. Majority op., ¶ 34 n.11. What follows from this is that at the trial of such a defendant later prosecuted for the crime, suppression of the showup identification will not occur unless the defendant is able to meet the current test showing the identification was unreliable.[4] If the due process clause of Article I, Section 8 of the

---

[4] As set out in *State v. Wolverton*, 193 Wis. 2d 234, 533 N.W.2d 167 (1995), such a defendant must prove that the showup was impermissibly suggestive. *Id.* at 264. If he does so,

Wisconsin Constitution truly requires the suppression of identifications made through the use of a showup, the majority opinion provides those suspects for whom law enforcement has less evidence of guilt with less constitutional protection when that person comes to trial. The majority opinion may also place a defendant in the unusual position of arguing that law enforcement had probable cause to arrest, so the showup identification was unnecessary and accordingly should be suppressed. This is an odd position in which to place a defendant whose defense is, "It wasn't me."

¶ 88. In the case before us, Dubose's showup identification was done in person, within 30 minutes of his commission of the armed robbery, which occurred in a well-lighted apartment, when he wore no mask, the victim had a significant period of time to view him and Dubose had been seen by the victim prior to the date of the robbery. There is no indication of unreliability in this identification.[5] Nevertheless, in the event of a new trial, the majority opinion will deny a jury the right to

then the State is required to prove that "under the 'totality of the circumstances' the identification was reliable." *Id.* (citations ommitted).

[5] I disagree with the majority's discussion citing *Foster v. California,* 394 U.S. 440 (1969), as in that case, the witness initially could not positively identify the suspect and was "talked into" identifying the suspect after speaking with him one-on-one and viewing another lineup. There, even though the witness could not initially identify the suspect, "[i]n effect, the police repeatedly said to the witness, 'This is the man.' " *Id.* at 443. Here, while the second showup and photograph identification were needlessly redundant, they were used by police to ask the victim, "Are you sure?" They were not used to talk the witness out of an initial failure to identify Dubose. Accordingly, the coercive nature of the identification procedures in *Foster* was not present here.

hear this relevant, reliable evidence, and unless the circuit court concludes that there is an independent basis for the identification of Dubose that the victim made at trial, that identification will be suppressed also. Majority op., ¶ 38. By so doing, the majority sets up a process where witnesses will be prevented from identifying the perpetrator of the crime for the jury. How does due process require and how is justice served by refusing to permit the admission of this relevant, reliable evidence? In my view, due process does not require it and justice is not served. Instead, the perpetrator of a violent armed robbery may be set free to victimize others.

¶ 89. The majority's main basis for holding that showups must be suppressed is "extensive studies on the issue of identification evidence" that assert that eyewitness testimony is " 'hopelessly unreliable.' " Majority op., ¶¶ 29–30 (quoting *Commonwealth v. Johnson*, 650 N.E.2d 1257, 1262 (Mass. 1995)).[6] In my view, the majority opinion errs by adopting a disputed social science theory as a requirement for constitutionally sufficient due process instead of continuing to focus on the reliability of the evidence.

¶ 90. The research cited by the majority does not represent the only social science theory on the subject of identifications. Hard data that social scientists have analyzed have resulted in disagreements about the unreliability of showups. One social science study reports that "[o]verall, the results present surprising commonality in outcome between [showups and line-

---

[6] It should be noted that the broad statement quoted from *Commonwealth v. Johnson*, 650 N.E.2d 1257, 1262 (Mass. 1995), is not limited to showup identifications. It questions *all* eyewitness identifications. Will the next step for this court be the suppression of all eyewitness identifications?

195

ups] and . . . an apparent contradiction of the ambient knowledge that showups are more dangerous for innocent suspects than are lineups." Nancy Steblay, et al., *Eyewitness Accuracy Rates in Police Showup and Lineup Presentations: A Meta-Analytic Comparison,* 27 Law and Human Behavior 523, 535 (2003). Steblay reported that

> [w]hen overall identification decisions are tabulated, showups produce an accuracy advantage over lineups (69% vs. 51%). This initial result is qualified by subsequent analyses. As anticipated, a consideration of specific subject choices provides a more complete picture. Correct identification (hit) rate within the context of a target-present condition is nearly identical for the two types of procedures:   Approximately 46% of witnesses shown either a lineup or a showup correctly identified the perpetrator when he or she was present. False suspect identification rates in a target-absent display are also approximately equal between showups and lineups, at about 16%.

*Id.*

¶ 91.   Another study reports, "[O]ur results suggest that the formal task structure of a one-person showup does not create an unacceptable increase in the risk that an innocent suspect will be identified as the perpetrator." Richard Gonzalez, et al., *Response Biases in Lineups and Showups,* 64 Journal of Pers. and Soc. Psychol. 525, 533 (1993). One of the experiments that Gonzalez conducted showed "a striking tendency for subjects to respond no to the showup but yes to the lineup." *Id.* at 528.

¶ 92.   The majority opinion attempts to gain support for its reliance on a disputed social science theory by paralleling its use of social science data with the reference to social science reports in the landmark

decision by the United States Supreme Court in *Brown v. Board of Education,* 347 U.S. 483 (1954). Majority op., ¶¶ 43–44. The majority opinion asserts, "we have no trouble following the lead of *Brown.*" Majority op., ¶ 44.

¶ 93.  However, the *Brown* holding was not made in reliance on a social science theory, nor was *Brown* the earliest or the latest case to refer to a social science report. *See, e.g., Roper v. Simmons,* 125 S. Ct. 1183 (2005); *Paris Adult Theatre I v. Slaton,* 413 U.S. 49 (1973); *Muller v. Oregon,* 208 U.S. 412 (1908). The reports in *Brown* were listed in one footnote and used without discussion to support one sentence in the entire opinion. *Brown,* 347 U.S. at 494 n.11. Rather, *Brown* is preeminent because it judicially proclaimed that the enormity of suffering that generation after generation of African-Americans were forced to endure by the doctrine of "separate but equal" simply because they were a different color, was unconstitutional. I object to the manner in which the majority opinion uses *Brown* because it trades on *Brown's* prestigious position in American jurisprudence to support the majority opinion's reliance on a disputed social science theory.

¶ 94.  No one wants the wrong person identified as the perpetrator of a crime. However, where I part company with the majority opinion and the concurrence is that I am not willing to throw out identifications like the one now before us that are reliable, as the means of addressing those identifications that are not reliable. Suppressing the use of a reliable identification is not necessary in order to guarantee due process of law because it is only an unreliable identification that violates due process. *Stovall,* 388 U.S. at 301–02.

¶ 95.  All identification procedures, from showups to lineups to photo arrays, can be improved by crafting

better techniques for these methods to reduce suggestiveness and increase reliability.[7] Proposed improvements include videotaping eyewitness identifications and making standard the need for officers to inform eyewitnesses that the suspect in the showup may not be the perpetrator or that the perpetrator may not be included in the lineup or array. *See* Gary L. Wells & Elizabeth A. Olson, *Eyewitness Testimony,* 54 Ann. Rev. Psychol. 277, 286 (2003). Research and common sense agree with former United States Attorney General Janet Reno's statement that, "Even the most honest and objective people can make mistakes in recalling and interpreting a witnessed event; it is the nature of human memory." United States Department of Justice, *Eyewitness Evidence: A Guide for Law Enforcement,* at iii (1999), *available at* http://www.ncjrs.org/pdf files1/nij/178240.pdf. Other proposed enhancements include allowing expert testimony on the reliability of eyewitness identifications or jury instructions on eyewitness identification. None of these well-respected sources advocate the ban of showup identifications as the majority opinion has done. Instead, they advocate for law enforcement education on how to better conduct eyewitness identifications and for a more complete presentation of the problems with eyewitness identification at trial.

---

[7] I do not contend that "eyewitness identifications are inherently reliable," Justice Butler's concurrence, ¶ 49. I recognize that no form of eyewitness identification is reliable 100% of the time. But I do contend that an eyewitness identification made by a witness very soon after the witness observed the commission of the crime and the witness had a good opportunity to view the perpetrator for a significant period of time is not inherently unreliable.

¶ 96.  In sum, because reliability, and not a disputed social science theory, must be the key to admissibility of all identification testimony in criminal trials and because I conclude that the totality of circumstances bearing on the identification in this case resulted in a reliable identification of Dubose as the perpetrator of the armed robbery of which he was convicted, I would affirm the court of appeals.

¶ 97.  Accordingly, I respectfully dissent from the majority opinion.