**IN THE COURT OF APPEALS OF IOWA**

No. 16-0590
Filed May 3, 2017

**STATE OF IOWA,**
　　　　Plaintiff-Appellee,

**vs.**

**VERNARD ARCHER,**
　　　　Defendant-Appellant.
_____

　　　　Appeal from the Iowa District Court for Johnson County, Sean W. McPartland, Judge.

　　　　Vernard Archer appeals his convictions for first-degree burglary, assault while using a dangerous weapon, and third-degree sexual abuse. **AFFIRMED.**

　　　　Mark C. Smith, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

　　　　Thomas J. Miller, Attorney General, and Martha E. Trout, Assistant Attorney General, for appellee.

　　　　Considered by Potterfield, P.J., and Doyle and Tabor, JJ.

**DOYLE, Judge.**

Vernard Archer appeals his convictions for first-degree burglary, assault while using a dangerous weapon, and third-degree sexual abuse. Archer contends his trial counsel was ineffective for failing to move to suppress the "show up" identification procedure,[1] which he alleges violated his due process rights under the Iowa Constitution, and for failing to present expert testimony or request a jury instruction regarding the limitations of eyewitness identification. Archer also argues his counsel was ineffective in failing to challenge the sufficiency of the evidence supporting his sex-abuse conviction. Because Archer has failed to prove the alleged deficiencies in his trial counsel's performance prejudiced him, we affirm.

### I. Background Facts and Proceedings.

On December 7, 2014, E.W. was sleeping on a living room couch in her boyfriend's Iowa City apartment when she awoke at an early morning hour to find a strange man in the room. The room was dim, lit by two or three miniature Christmas trees, Christmas lighting strung up along the ceiling of the apartment, a light on the stove, and lights from outdoors. Although E.W. was not wearing her glasses, she "briefly" got a good look at the intruder's face before he attacked her and pinned her against the couch with her knees on the floor and her torso and face on the couch. The intruder crouched over her with his knees also on the ground and his whole body over hers. The intruder warned E.W., "Bitch I will

---

[1] A "show up" identification "is an out-of-court pretrial identification procedure in which a suspect is presented singly to a witness for identification purposes." *State v. Dubose*, 699 N.W.2d 582, 585 n.1 (Wis. 2005) (quoting *State v. Wolverton*, 533 N.W.2d 167, 177 n.21 (Wis. 1995)).

kill you" if she screamed and he placed a knife against her neck. Through her jeans, E.W. could feel his erect penis rubbing against her buttocks and genital area. He was rocking back and forth in kind of a grinding motion, breathing heavily in her ear, and saying that he would kill her. After about two minutes of this, E.W. screamed and the intruder pressed the knife harder into E.W.'s neck. The intruder tackled E.W. to the ground and the knife went in harder. A noise came from a bedroom, and the intruder froze. When E.W.'s boyfriend came out of his bedroom, the intruder stood up, turned for the door, and ran out. E.W. told her boyfriend what happened, and one of his roommates immediately called 911. The call was made at 4:45:34 a.m.

In the 911 call, the intruder was described as a fat black male, around 5'8"-5'9" in height, wearing a black hoodie, jeans, and a "creepy" clear plastic mask. Police officers were on the scene in minutes. E.W. described the intruder as a heavy-set black male, about 5'8" in height, wearing a dark black Carhartt-style coat with a hood, a clear mask, a yellow undershirt, and a beanie hat.

Officers began looking for the suspect in the vicinity of the apartment. A short time later, two campus officers from the University of Iowa Police Department located and detained a suspect of possible interest—a black male who was near the location of the apartment. E.W. was taken to the location of the detainee. When she saw the individual, she immediately knew he was not the intruder, and she told the officers this. She told the officers the detainee was too tall, too thin, and his skin tone too light. E.W.'s boyfriend was taken separately to the location. He was not sure if the individual was the one he saw

in the apartment. E.W. and her boyfriend were then taken back to the apartment, and the subject was let go.

In the meantime, at 5:22 a.m., about six blocks from the apartment, another officer looking for the suspect saw a person matching the description of the suspect. He was wearing a Carhartt-style jacket, a hooded coat under the jacket, and a yellow shirt. The officer stopped the person, who identified himself as Archer.

E.W. was taken to the location where Archer was detained. She viewed Archer from across the street while he was struggling with officers and immediately identified him. When she saw Archer, she told officers, "That's him." She said she was "a hundred percent sure." E.W.'s boyfriend was also taken to the location but was unable to say if Archer was the person he saw running out of the apartment. Archer was arrested. A knife bearing E.W.'s DNA was later found in a courtyard adjacent to the apartment building.

Archer was charged with burglary in the first degree, a class "B" felony, in violation of Iowa Code sections 713.1, 713.3(1)(c) and 713.2 (2015), assault while displaying a dangerous weapon, an aggravated misdemeanor, in violation of section 708.2(3), and sexual abuse in the third degree, a class "C" felony, in violation of sections 709.1(1), 709.4(1) and 702.17. A jury found Archer guilty as charged. He now appeals, contending his trial counsel was ineffective in failing to move to suppress the identification procedure under the Iowa Constitution and in failing to call an expert or request an instruction regarding eyewitness testimony. He also contends his trial counsel was ineffective in failing to

challenge the sufficiency of the evidence to establish that he committed a "sex act."

## II. Standard of Review.

We review ineffective-assistance-of-counsel claims de novo. *See State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008). Generally, we prefer to preserve ineffective-assistance claims for postconviction-relief proceedings, but we may resolve such claims on direct appeal if the record is sufficient. *See State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010). We find the record is sufficient in this case.

## III. Ineffective Assistance of Trial Counsel.

To prove his claim of ineffective assistance of counsel, Archer must show: (1) his counsel failed to perform an essential duty; and (2) this failure resulted in prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Halverson*, 857 N.W.2d 632, 635 (Iowa 2015). Archer must prove both of these elements by a preponderance of the evidence to prevail, and we may affirm on appeal if either element is lacking. *See Strickland*, 466 U.S. at 687. To show prejudice, Archer "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

### A. Show-up identification procedure.

Archer argues his counsel was ineffective for failing to move to exclude the identification on state due process grounds. Iowa courts have adopted the federal "reliability" standard to determine the admissibility of an out-of-court

identification. *See State v. Folkerts*, 703 N.W.2d 761, 763-64 (Iowa 2005); *State v. Webb*, 516 N.W.2d 824, 829-30 (Iowa 1994). Under this standard, the court must determine: (1) if the out-of-court identification procedure was impermissibly suggestive; and (2) if so, whether the procedure gave rise to "a very substantial likelihood of irreparable misidentification" under the totality of the circumstances. *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). While conceding that Iowa courts have embraced the federal approach, Archer lobbies for a move to the "necessity" standard followed in Wisconsin in light of continuing scientific research on the reliability of eyewitness identification and the Iowa Constitution's significant protections of individual rights.[2] Under the "necessity" standard, out-of-court

---

[2]The routing statement in the appellant's brief asks for our supreme court to retain this appeal because it involves a substantial issue of first impression in Iowa, but the supreme court transferred the case to us.

This issue has been presented to us previously. In *State v. Williams*, No. 10-1254, 2011 WL 5394366, at *1 (Iowa Ct. App. Nov. 9, 2011), after his conviction for robbery in the first degree, Williams appealed on the grounds his trial counsel was ineffective for failing to file a motion to suppress the show-up identification used in his case. Like Archer, Williams argued for the adoption of Wisconsin's rule regarding show-up-identification procedures. *Williams*, 2011 WL 5394366, at *3. This court declined to reach the issue of whether Iowa should adopt Wisconsin's standard and instead resolved the matter on prejudice grounds. *Id.* We noted other evidence presented at trial undermined Williams's prejudice claim, such as video surveillance independently showing the robber wearing clothing matching Williams's clothing, Williams ignoring the police when ordered to stop, the discovery of a knife in the snow bank where Williams had fallen similar to the knife observed by the victim, and the discovery Williams's pockets contained an amount of change consistent with the amount the victim had reported stolen. *Id.* at *4. Application for further review was denied by the supreme court.

Similarly, in *State v. Neal*, No. 15-0886, 2016 WL 4384621, at *1 (Iowa Ct. App. Aug. 17, 2016), after his conviction for robbery in the first degree and felon in possession of a firearm, Neal appealed on the grounds his counsel failed to perform an essential duty when she did not move to exclude the pre-trial show-up identification on state due process grounds. *Neal*, 2016 WL 4384621 at *2. Like Archer, Neal argued for the adoption of Wisconsin's rule regarding show-up-identification procedures. *Id.* This court declined to reach the issue of whether Iowa should adopt Wisconsin's standard and instead resolved the matter on prejudice grounds. *Id.* at *3. We noted other evidence

show-up identifications are "inherently suggestive" and inadmissible unless the show-up-identification procedure was necessary under the totality of the circumstances. *See Dubose*, 699 N.W.2d at 593-94.

We need not address the issue of trial counsel's failure to perform an essential duty because Archer has not shown he was prejudiced by the alleged breach. To prove prejudice, Archer must demonstrate a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Halverson*, 857 N.W.2d at 639 (quoting *Strickland*, 466 U.S. at 694). In making this determination, we consider the evidence as a whole as well as the extent of the effect of counsel's purported error on the overall trial. *See State v. Graves*, 668 N.W.2d 860, 882-83 (Iowa 2003).

To analyze the prejudice prong, we turn to the evidence considered by the jury in this matter. The identifications took place shortly after E.W.'s assault. The officers drove E.W. separately from her boyfriend to the location so the couple would not influence each other. E.W. was instructed by the officer that

> there's no indication that the person we've stopped is involved in this particular criminal activity that they witnessed or any criminal activity. We tell them also that it is just as important to clear an innocent person as it is to find a guilty person . . . .

E.W.'s identification of Archer came after she told officers that the detainee at the first location was definitely not the person who assaulted her in her boyfriend's

---

presented at trial undermined Williams's prejudice claim, such as surveillance video, items found in Neal's vehicle, Neal's near proximity to the crime scene only a short time after the 911 call, evidence found near where the foot chase began, and recordings of Neal's telephone calls from the jail. Application for further review was denied by the supreme court.

Indeed, the factual similarities between these matters are numerous—particularly the evidence independent of the show-up identification demonstrating the strength of the State's case. Accordingly, we resolve Archer's claim as we resolved Williams's and Neal's claims.

apartment. At the second location, E.W. immediately identified Archer as the one who attacked her—and she was one-hundred percent sure. Archer's body type fit the description E.W. gave of her attacker. The clothing worn by Archer at the time of his arrest fit the description of the clothing E.W. observed to be worn by her attacker. But even if the identification evidence had been suppressed, there is no reasonable probability of a different verdict.

Coincidentally, Iowa City Police Officer LaKose encountered Archer very near the scene of the assault around the time it occurred. On December 7, 2014, at 4:34 a.m., Officer LaKose responded to the report of a burglary at an apartment. The residents of the apartment told the officer someone had tried to enter the apartment through a sliding glass door. The sliding glass door is along a walkway that leads to the adjacent apartment complex where E.W. had been attacked. It appeared to the officer that the sliding glass door had been pulled off its tracks from the outside. Sometime between 4:30 and 4:50 a.m., as he was attempting to secure the door, Officer LaKose was surprised to observe an individual walking out of a door into the courtyard between the apartment complexes. The individual saw the officer. At trial Officer LaKose testified:

> Q. And what did you note about the individual? A. We both kind of paused and looked at each other, and since the door was again kind of partially in and out, you could—you could feel the cold air coming from the outside. I spoke to him, and I said, "Are you all right?" or something similar to that. After a brief moment, he said, "Yes, I'm all right, and put his hands up."
> Q. Why did you ask him that? A. A little bit—I didn't know what to say because it was the whole shock factor that he came through that door, and that he was kind of walking through and paused and stopped after seeing a police officer through a sliding glass door. So I wondered if he was all right.
> Q. Did you assess what he was wearing? A. I did get a look at what he was wearing, yes. He had on—it looked like—it's kind of

hard to describe—a hat as I call it, got the ear flaps over with rabbit fur or something on the inside; a dark colored coat, which I would describe as being Carhartt-styled coat; dark pants; and there was a shirt underneath it that was bright yellow or white, bright color.

Q. Could you tell anything about his individual characteristics? A. My initial appearance of him, because he was wearing a little bit baggy clothing at the time or multiple layers with the coat and the shirts underneath it, the only thing I could see was that appearance as well as it being an African male—African-American male, a little bit bigger.

After this encounter, the individual walked very quickly away. Two or three minutes later, Officer LaKose received a radio dispatch concerning an armed robbery that occurred in an apartment just across the courtyard. Officer LaKose testified,

Once I heard that radio traffic, knowing that we're talking about 4:50 in the morning, there's not a lot of foot traffic. And working nights, you'll see somebody every once in a while, but it's kind of uncommon, so having somebody come out of that courtyard in such close proximity to the time that that call came out, to me, I felt that this was the individual that was involved.

He left the apartment to see if he could catch up with the individual but did not see anyone. The officer communicated this information to dispatch. When Officer LaKose heard the description of E.W.'s assailant from another officer, he knew that was the individual that he had seen in the courtyard. Officer LaKose then drove to the location where Archer was being detained. As he pulled up, he "instantly knew that [Archer] was the individual that [he] saw walking out of that courtyard." He briefly spoke to Archer:

My initial conversation with him was asking where he was coming from, where he indicated he was coming from the bars in the downtown area. Getting more specific, I asked him if he remembered speaking with me. I think he was kind of passive with that and indicated that he didn't. Spoke with him a little bit more and said, "Do you not remember seeing me as you came out of that courtyard and saw me inside that apartment? And I asked you a

question whether you were okay." Me asking that question, whether you were okay, he actually changed it to how I actually asked that question, and I think I asked, "Are you all right" or something similar, which he corrected me. And then he said that, yes, I did ask him something and he had put his hands up, which is exactly what I saw.

Officer LaKose then returned to the courtyard area because,

[k]nowing that [an officer] patted him down for weapons upon making contact with him to make sure that he and the officers arriving are safe, didn't locate a knife, I thought that was a little suspicious, so I decided to backtrack where I saw him up to the apartment area. So I walked into the courtyard to take a look around to see if there was anything, because one of the things that I noticed was—and I thought maybe I was seeing something— when I looked out to see him through a glass door, I thought he was wearing a mask or something transparent over his face, and that wasn't located on him either, so I wanted to go through that courtyard to see if there was a knife or some sort of a mask or anything left behind by this individual.

He found a steak knife hidden under a ladder in the courtyard. The knife was later found to have E.W.'s DNA on it. Officer LaKose identified Archer in the courtroom as the man he saw the morning of E.W.s assault.

All of this evidence undermines Archer's prejudice argument. Therefore, his claim of ineffective assistance on the identification issue fails.

**B. Identification expert witness or instruction.**

Archer contends his trial counsel was ineffective in failing to call an expert witness or request an instruction regarding eyewitness testimony. Again, we need not address the issue of trial counsel's failure to perform an essential duty because Archer has not shown he was prejudiced by the alleged breach.

Regarding the issue of eyewitness testimony, our supreme court recently said:

The reliability of eyewitness testimony has been the subject of intense commentary in academia and in the courts. According to one article, "eyewitness misidentification is by far the most frequent cause of erroneous convictions." Samuel R. Gross, *Loss of Innocence: Eyewitness Identification and Proof of Guilt*, 16 J. Legal Stud. 395, 396 (1987). Yet, juries often attach great weight to eyewitness identification without consideration of reliability. *See State v. Hunt*, 69 P.3d 571, 576-77 (Kan. 2003) (noting that juries "usually attach great weight to eyewitness identification, while others involved in a trial know and other disciplines have documented that such identification is often unreliable").

Preparing for eyewitness identification is an essential responsibility of defense counsel. Eyewitness testimony may have a dramatic influence on overall defense strategy or theory of the case. Defense counsel must consider a pretrial motion to suppress. Voir dire may be used to educate the jury about honestly mistaken witnesses. Defense counsel must be prepared to explore the potential for error in the identification process through effective cross-examination. Cross-examination, however, is not likely to be effective when a person is genuinely mistaken about past events. Consideration should be given to obtaining expert witness testimony of the problems with eyewitness identification. *See State v. Schutz*, 579 N.W.2d 317, 319 (Iowa 1998) (holding admission of expert witness on eyewitness identification within sound discretion of the court); *see also People v. McDonald*, 690 P.2d 709, 725-26 (Cal. 1984) (en banc) (holding exclusion of expert on reliability of eyewitness testimony was an abuse of discretion), *overruled on other grounds by People v. Mendoza*, 4 P.3d 265, 286 (Cal. 2000). Special instructions for the jury may need to be considered. Summations must be designed to deal with the eyewitness identification.

*State v. Shorter*, ___ N.W.2d ___, ___, 2017 WL 1367014, at *14 (Iowa 2017).

Subject to the discretion of the district court, expert testimony on eyewitness identification may be presented in a criminal trial. *See Schutz*, 579 N.W.2d at 320. Additionally, Iowa has a uniform instruction addressing eyewitness identification.[3] Although proffer of eyewitness-identification expert

---

[3] Iowa Criminal Jury Instruction 200.45 provides:

The reliability of eyewitness identification has been raised as an issue. Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to see

testimony and a request for the eyewitness-identification instruction would have been appropriate in this case, Archer has not proven he was prejudiced by his trial counsel's failure to either offer expert testimony or request the instruction.

Officer LaKose, a trained police officer, saw Archer near the time and place of E.W.'s assault. Archer's body-type and the clothing he was wearing at the time of his arrest matched the observations made by three persons—E.W., her boyfriend, and Officer LaKose. Less than forty-five minutes after E.W. was assaulted, Archer was found some six blocks from the crime scene. He claimed he was coming from work. The detaining officer asked Archer about the odor of alcohol on his breath, and Archer said he actually worked earlier and was coming from a downtown Iowa City bar. The officer pointed out that the bars had been closed for at least three hours and asked Archer what he had been doing in the meantime. Archer did not give an answer to the officer. When Officer LaKose spoke to Archer while he was detained, Archer acknowledged he was the individual Officer LaKose observed earlier in the apartment courtyard. Because

---

the person at the time of the crime and to make a reliable identification later.

In evaluating the identification testimony of a witness, you should consider the following:

1. If the witness had an adequate opportunity to see the person at the time of the crime. You may consider such matters as the length of time the witness had to observe the person, the conditions at that time in terms of visibility and distance, and whether the witness had known or seen the person in the past.

2. If an identification was made after the crime, you shall consider whether it was the result of the witness's own recollection. You may consider the way in which the defendant was presented to the witness for identification, and the length of time that passed between the crime and the witness's next opportunity to see the defendant.

3. An identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.

4. Any occasion in which the witness failed to identify the defendant or made an inconsistent identification.

a knife was not found on Archer when he was patted down, Officer LaKose decided to backtrack to the apartment complex courtyard to see if a mask or knife was left behind. He found a steak knife under a ladder. The location of the knife was in the path Archer took from the courtyard. E.W.'s DNA was found on the knife. Additionally, the centerpiece of Archer's trial counsel's closing argument to the jury focused on the deficiencies of the eyewitness testimony.

Even had Archer's trial counsel challenged the eyewitness identifications by calling an expert witness, by requesting the stock eyewitness-identification instruction, or by doing both, there is no reasonable possibility of a different outcome at trial. Archer has not proven the prejudice prong of his ineffective-assistance-of-counsel claim. His claim of ineffective assistance on the eyewitness-testimony issue therefore fails.

**C. Insufficient evidence of a "sex act."**

Archer also contends the evidence was insufficient to support his third-degree-sexual-abuse conviction because E.W.'s testimony that she felt contact with her "genital area" and "butt" is not specific enough to establish that a "sex act" occurred.

The State contends Archer failed to preserve error by not raising this claim in his motion for judgment of acquittal. *See State v. Truesdell*, 679 N.W.2d 611, 615 (Iowa 2004) ("To preserve error on a claim of insufficient evidence for appellate review in a criminal case, the defendant must make a motion for judgment of acquittal at trial that identifies the specific grounds raised on appeal."). Archer did move for a judgment of acquittal at the close of the State's

case but failed to specifically raise this claim.[4]  Therefore, it was not preserved for our review.  Anticipating this impediment, Archer asks us to consider his sufficiency claim under the ineffective-assistance-of-counsel rubric.  *See State v. Fountain*, 786 N.W.2d 260, 263 (Iowa 2010) ("Ineffective-assistance-of-counsel claims are an exception to the traditional error-preservation rules.").  Thus we will consider Archer's challenge to the sufficiency of the evidence within the context of an ineffective-assistance-of-counsel claim.  We can resolve Archer's ineffective-assistance-of-counsel claim under the prejudice prong.

As relevant here, a "sex act" is defined as "contact between the genitalia of one person and the genitalia or anus of another person."  Iowa Code § 702.17(2).  E.W. testified that Archer tackled her, took her to the ground, and then pinned her against the couch.  Her knees were on the floor and her torso and face were on the seat of the couch.  Archer was crouched over her with his knees on the ground and "had his whole body on [her] body."  She felt his erect penis on her "backside."  Archer rocked back and forth in a "grinding motion" on E.W.'s "butt and genital area."  Even though she had jeans and a blouse on, she could feel his erect penis on her butt and genital area, and she noted he was breathing heavily as if he was sexually aroused.  On redirect examination, E.W. stated there was no doubt in her mind that Archer was touching her genital area.

---

[4] In moving for a judgment of acquittal at the close of the State's evidence, Archer acknowledged the law does not require skin-to-skin contact but argued the evidence was insufficient because he was wearing at least three different layers of clothing when he was arrested, which "would be sufficient objectively to prevent the perception of touch to the areas that are required to satisfy the sex act criteria."  *See State v. Pearson*, 514 N.W.2d 452, 455 (Iowa 1994) (holding "skin-to-skin contact is not required in order to establish a 'sex act' under section 712.17" and determining "prohibited contact occurs when (1) the specified body parts or substitutes touch and (2) any intervening material would not prevent the participants, viewed objectively, from perceiving that they have touched").

Archer contends this testimony is not sufficiently specific enough to conclude that "'contact between the genitalia of one person and the genitalia or anus of another person' had occurred." We disagree.

In evaluating the sufficiency of the evidence, we view it in the light most favorable to the State and make every legitimate inference and presumption that may fairly and reasonably be deduced from the record in the State's favor. *See State v. Webb*, 648 N.W.2d 72, 76 (Iowa 2002). "[W]e are mindful that our cases demonstrate a 'long-standing preference for submitting criminal cases to a jury if there is any substantial evidence tending to support the charge.'" *State v. Martens*, 569 N.W.2d 482, 487 (Iowa 1997) (citation omitted). When the testimony is viewed in context—and drawing all reasonable inferences from the testimony in favor of the State—it is clear that E.W. was describing acts that support Archer's sexual-abuse conviction. Archer is thus unable to show a reasonable likelihood the outcome of the trial would have differed if his trial counsel had made a motion for acquittal on the basis E.W.'s testimony did not establish that a "sex act" occurred. Accordingly, Archer's ineffective-assistance-of-counsel claim on this issue fails.

**IV. Conclusion.**

Archer has not proven the prejudice prong of his ineffective-assistance-of-counsel claims. Accordingly, we affirm Archer's convictions and sentences.

**AFFIRMED.**